# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-1213

LaTeirra R. Sublett,

*Plaintiff-Appellant,*

*v.*

John Wiley & Sons, Inc. &
Wiley Publishing, Inc.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:03-CV-0347-SEB-JPG—**Sarah Evans Barker**, *Judge.*

Argued January 6, 2006—Decided September 13, 2006

Before Easterbrook, Manion, and Wood, *Circuit Judges.*

Wood, *Circuit Judge.* LaTeirra R. Sublett, an African-American woman, sued John Wiley & Sons, Inc., and Wiley Publishing, Inc. (to whom we refer collectively as "Wiley"), alleging that they failed to promote her, gave her unwarranted poor performance reviews, and retaliated against her for filing a complaint about race discrimination in violation of both Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. The district court granted summary judgment in favor of Wiley. Although some of Sublett's allegations, if true, reflect unfortunate behavior, we conclude that she failed to

establish a *prima facie* case or pretext with respect to any of her claims. We therefore affirm the district court's judgment.

**I**

On June 1, 1999, Wiley's predecessor, IDG Books World-wide, Inc. (IDG), hired Sublett as a Customer Care Repre-sentative (CCR). Her qualifications for this posi-tion included a high school diploma, certification as an administrative assistant based on her completion of an eight-month training course at Midwest Career College, and an employment history including work as a food server, a customer service representative at another company, a telemarketer, and an insurance collector. At the time Sublett was hired, she was the only African-American employee in the Customer Care Department.

In 2000, IDG created four Senior CCR positions. Sublett's supervisor Felicite Pickens, an African-American woman who had been hired after Sublett, encouraged her to apply for one of these positions. Pickens, however, was fired soon thereafter and played no role in determining who was selected. Instead, supervisors Breea Hosier and Linda Perkins interviewed Sublett for one of the available posi-tions. Hosier and Perkins filled three of the slots with white employees. Initially, they did not select Sublett for the fourth available position because they thought that she was insufficiently enthusiastic about the job in her interview and that she had a conflict with another employee, Vicki Bess. Sublett had more seniority at the company than some of the employees who were selected for the promotion.

When Sublett found out that she did not receive the CCR position, she emailed Chad Secrist, an employee in the Human Relations Department, to find out what steps she could take if she thought the reason for her lack of success was racial discrimination. This email triggered a

series of events that eventually led to a meeting among Sublett, Hosier, Perkins, and Sherry Marcuson, another employee in the Human Relations Department. At this meeting, Sublett informed Hosier and Perkins that she did not have a conflict with Bess and was in fact enthusiastic about the position. After the meeting, Perkins and Hosier promoted Sublett to a Senior CCR position effective August 21, 2000.

In September 2001, Sublett received her annual performance review. The review covered six categories with four possible ratings for each category: "Outstanding Performance," "Exceeds Performance Expectations," "Proficient," and "Needs Improvement." Sublett, who had been evaluated by Hosier and Perkins, received the "Proficient" rating in each category. Based on this review, Sublett received a 4% merit pay increase. Around the same time, John Wiley & Sons, Inc. acquired IDG (which had since become Hungry Minds) and changed the company's name to Wiley Publishing, Inc.

In February 2002, Wiley restructured its Customer Care Department. As a result of this reconfiguration, two "team leader" supervisory positions became available, a day-shift position and a night-shift position. Hosier asked Sublett which position she preferred, and Sublett replied that she was interested in the day-shift position. Sublett was one of five employees and the only African-American to express interest in the day-shift position. Ultimately, Hosier and Perkins hired Mary Roberts, a white woman, for the job. The reason they gave to Sublett for her lack of success was that they did not think that she was ready to assume the responsibilities of a team leader. Later, in June 2002, another team leader position became available. Hosier and Perkins again considered Sublett for the position, but they eventually hired Michael Shoptaw, a white male from outside the company. On June 17, 2002, after sending several emails to Wiley supervisors complaining about not

receiving a promotion, Sublett filed a claim with the Equal Employment Opportunity Commission (EEOC), asserting race discrimination and retaliation.

On August 8, 2002, the Director of Human Resources, along with Marcuson, Hosier, and Perkins, held a meeting with Sublett to discuss her complaints. At this meeting, Sublett expressed her belief that she had been passed over for the available promotions because of her race. Perkins disagreed, claiming instead that she had not been selected because she lacked the requisite leadership skills and was not as qualified for the position as the applicants that were hired. As a result of this meeting, Sublett received a Development Plan, which detailed the areas in which she would need to improve in order to qualify for future promotions.

In September 2002, Sublett received her 2002 annual performance review, which also used four possible ratings: "Substantially Exceeded," "Fully Met," "Acceptable w/ Qualifications," and "Less Than Acceptable." Sublett received two "Fully Met" ratings, four "Acceptable w/ Qualifications" ratings, and a 3% merit pay increase.

On October 23, 2002, Sublett filed a second EEOC charge for race discrimination and retaliation. In addition to complaining about the 2000 and 2002 promotion decisions, she alleged that Wiley retaliated against her by giving her poor performance reviews in 2001 and 2002. Shortly after Sublett filed this claim, Hosier and Perkins promoted her to a team leader position that had recently become available.

On December 12, 2002, the EEOC issued Sublett a right-to-sue letter; Sublett filed her complaint in federal district court on March 7, 2003. When the time came for the district court to consider Wiley's motion for summary judgment, Sublett responded with evidence of Wiley's failure to promote her in 2000 and 2002 and her negative

performance reviews in 2001 and 2002. She also submitted the testimony of Felicite Pickens, her former supervisor. Pickens testified that supervisors Hosier and Perkins rarely talked to African-American employees. In addition, Pickens claimed that on at least one occasion, Perkins asked her to change the performance evaluation of a white employee to reflect a more positive rating than Pickens believed the employee actually deserved. Additionally, Sublett submitted testimony from Secrist, the Human Relations employee to whom she initially complained. Secrist alleged that another Human Relations employee (who had some role in the company's promotion decisions) commented that she "did not like black people." On a separate occasion, according to Secrist, Wiley's Vice President of Operations told Secrist that he would never accept anyone for a position at the company that did not have an "ethnically neutral voice." Sublett claimed generally that while supervisors Hosier and Perkins fired a number of African-American employees during her tenure at Wiley, including Felicite Pickens, they hired and promoted only white employees. She also accused Marcuson of treating white people more favorably than minorities; in fact, Sublett claimed, Marcuson treated African-American employees at the company with "disgust."

Sorting through this evidence and correlating it to Sublett's specific claims, the district court concluded that Sublett had failed to establish a *prima facie* case with respect to any of her discrimination or retaliation claims. The court accordingly granted Wiley's motion for summary judgment. We review the district court's order *de novo*, construing all facts and drawing all reasonable inferences from those facts in favor of Sublett. See *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1107 (7th Cir. 2004).

**II**

As a preliminary matter, we briefly address certain alleged procedural errors that Sublett claims prejudiced her. First, she argues that the district court improperly based its decision on an issue that Wiley failed to raise in its motion for summary judgment, namely, that Sublett had not presented evidence supporting a finding that Wiley's proffered reasons for failing to promote her in 2000 were pretextual. Sublett asserts that Wiley raised only a statute of limitations defense with regard to this claim. This switch in grounds, Sublett argues, deprived her of the opportunity to argue the issue of pretext before the district court.

It is true that in its motion for summary judgment, Wiley argued only that Sublett's claim based on the 2000 promotion was untimely because she filed her EEOC claim outside the 300-day period specified by Title VII and her § 1981 claim after the two years permitted under Indiana's statute of limitations. (In an intervening decision, the Supreme Court held that § 1981 claims are subject to a four-year statute of limitations, see *Jones v. R.R. Donnelley & Sons, Co.*, 541 U.S. 369 (2004); this change does not affect our decision.) As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision. See *Edwards v. Honeywell*, 960 F.2d 673, 674 (7th Cir. 1992) ("When a party moves for summary judgment on ground A, his opponent is not required to respond to ground B—a ground the movant might have presented but did not.") (quoting *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir. 1989).

The problem with Sublett's argument is that it does not reflect everything that happened in the district court. The record establishes that the question of pretext was briefed

thoroughly before the district court. For example, in her brief in opposition to Wiley's motion for summary judgment, Sublett specifically noted that "the reasons for not promoting [her] in 2000 [were] undisputed to be false" and that this was "evidence of the defendants' plan, motive, intent, and *pretext*." (Emphasis added.) In response, Wiley argued that "Sublett . . . failed to create a genuine issue of *pretext*" with respect to the 2000 promotion, as part of an extensive discussion of pretext. (Emphasis added.) Sublett was also permitted to file a surreply brief, in which she argued that the fact that she did not actually have a conflict with another co-worker "is evidence that Perkins . . . had not [*sic*] basis to believe that Sublett had a conflict with [another co-worker]. . . . Perkins was simply dishonest and had no basis for such a statement. . . . When the defendants lie about the plaintiff, it is evidence of pretext." Because Sublett had a "meaningful opportunity to come forward with all of [her] evidence" about pretext, *Simpson v. Merchants Recovery Bureau, Inc.*, 171 F.3d 546, 550 (7th Cir. 1999) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)), the district court was entitled to rely on this ground in its summary judgment decision.

Sublett also challenges the district court's finding that she did not name the correct defendant with respect to her claim about the 2000 promotion. The district court concluded that in 2000, Sublett's employer was either IDG or Hungry Minds, neither of which is a party to this suit. Our review of the record reveals that there has merely been a series of name changes—IDG changed its name to Hungry Minds, and Hungry Minds became Wiley Publishing, Inc. In the end, none of this matters: the district court offered this reason as one of several for rejecting Sublett's 2000 claim. We proceed on the assumption— favorable to Sublett—that these changes of ownership have no effect on Wiley's liability.

On the merits, we consider first Sublett's challenge to the district court's rejection of her claim that the reason why she did not initially receive a promotion to the senior CCR position in 2000 was because of her race. Racial discrimination of this kind is, of course, prohibited both by Title VII and § 1981. See 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 1981. Furthermore, "[a]lthough section 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical." *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 940 (7th Cir. 1996). The discussion that follows thus applies with equal force to Sublett's claims under both statutes.

A plaintiff can support her Title VII claim for failure to promote in one of two ways: "she may directly show that racial discrimination motivated the employment decision, or, as is more common, she may rely on the indirect, burden-shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Perdomo v. Browner*, 67 F.3d 140, 144 (7th Cir. 1995) (citations omitted). Sublett proceeds under the latter burden-shifting method. She therefore has the initial burden of establishing a *prima facie* case of race discrimination by showing that: "1) she is a member of a protected group; 2) she was qualified for the position sought; 3) she was rejected for the position; and 4) the employee promoted was not a member of the protected group and was not better qualified than the plaintiff." *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 732 (7th Cir. 2001).

If she passes that hurdle, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action, "which if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993) (citing *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981)). At that point, "[t]he plaintiff . . . resumes her original burden of

proof and must establish by a preponderance of the evidence that the defendant's proffered reasons are pretextual." *Perdomo*, 67 F.3d at 144.

Even assuming that Sublett established a *prima facie* case with respect to Wiley's failure to promote her in 2000, there is not enough evidence of pretext in this record to survive summary judgment. Pretext is a "lie, specifically a phony reason for some action." *Russell v. Acme-Evans, Co.*, 51 F.3d 64, 68 (7th Cir. 1995). In order to demonstrate a material issue of fact as to pretext Sublett must show that "1) it is more likely that a discriminatory reason motivated the employer than the proffered non-discriminatory reason or 2) that an employer's explanation is not credible." *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004) (citing *Guerrero v. Ashcroft*, 253 F.3d 309, 313 (7th Cir. 2001)).

Wiley has consistently asserted that it did not initially select Sublett for a promotion in 2000 because it believed that she had a conflict with another co-worker and that she did not express enough enthusiasm in her interview. After the responsible officials met with her and learned that their assumptions were wrong, she received the promotion. It is true that if Wiley's initial decision not to promote Sublett was based on race, its later decision to promote her does not erase the earlier discrimination. See *Molnar v. Booth*, 229 F.3d 593, 600-01 (7th Cir. 2000) ("The mere fact that the [adverse employment action] was reversed . . . and [plaintiff's] career put back on track does not diminish its importance during the time it lasted . . . . The short duration is naturally relevant to the degree of damage [plaintiff] suffered. . . ."). Sublett, however, has not offered any evidence that, if believed by a trier of fact, would demonstrate that Wiley's proffered justification for its initial decision was pretextual, rather than simply mistaken.

The other evidence to which she points does not do the job. She relies, for example, on evidence indicating that Perkins told Pickens, her former supervisor, to change the evaluation of a white employee to reflect a more positive rating. The problem with this "evidence," however, is that Sublett provides no supporting facts or explanatory details with respect to these events. Nothing indicates whether this request, which we assume was made, was based on race or on an honest disagreement with Pickens's assessment of the employee. Nor is there anything else in the record from which a trier of fact could determine whether Perkins systematically discriminated against minority employees or if she merely "show[ed] favorable treatment [to] one employee who happened to be white." *Jordan v. Summers*, 205 F.3d 337, 345 (7th Cir. 2000). Because there is insufficient evidence of pretext, the district court did not err in granting summary judgment in favor of Wiley with respect to the failure to promote in 2000 claim.

### III

Sublett also challenges the district court's rejection of her claim that Wiley discriminated against her in 2002 when it did not promote her. In 2002, as we noted earlier, Wiley considered Sublett for promotions in February, March, and June. With respect to the February and June decisions, we agree with the district court that Sublett failed to establish the fourth element of the *prima facie* case—that the employer promoted someone who was not in the protected class and was not as qualified as the plaintiff. Although neither of the successful candidates (Roberts and Shoptaw) is African-American, their qualifications for the team leader position were undeniably superior to those of Sublett's. For example, the job description for the team leader position rated past supervisory experience as "highly desirable." At the time she was being considered for these promotions,

Sublett had no supervisory experience. The successful candidates, in contrast, had two and nine years of supervisory experience respectively. See *Payne v. Milwaukee County*, 146 F.3d 430, 434 (7th Cir. 1998). The job description also indicated that some college study was desirable. Sublett's post-secondary education was limited to an eight-month administrative assistant training program. Roberts, on the other hand, had a bachelor of science degree in business, and Shoptaw had an associates degree in business and was enrolled in college marketing classes for two years.

Although evidence showing that the person who was hired was less qualified than the plaintiff may sometimes suffice to show pretext, see *Ash v. Tyson Foods, Inc.*, 126 S.Ct. 1195, 1197 (2006), the difference must be a significant one. As we held recently in *Mlynczak v. Bodman*, "evidence of the applicants' competing qualifications does not constitute evidence of pretext unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." 442 F.3d 1050, 1159 (7th Cir. 2006) (relying on *Millbrook v. IBP, Inc.*, 280 F.3d 1169 (7th Cir. 2002)). The evidence to which Sublett points to show that she was at least as qualified for the position falls short. She notes only that she had more seniority than Roberts and that she had better relations with other employees. This is not enough to meet her burden. See *Fisher v. Wayne Dalton Corp.*, 139 F.3d 1137, 1141-42 (7th Cir. 1998) (finding discrimination did not occur where an employee with more seniority was passed over for a position, because the less senior employee had superior qualifications for the position); *Dunn v. Nordstrom, Inc.*, 260 F.3d 778, 787 (7th Cir. 2001) (holding employer entitled to weigh plaintiff's accomplishments against deficiencies).

Sublett ran into a different problem with the March 2002 promotion: the district court found that her claim could not succeed because she never applied for that

position. Not surprisingly, this court has held that "[i]f a plaintiff does not apply for a vacancy that is posted, [she] cannot make a *prima facie* case for unlawful discrimination . . . under Title VII unless [she] demonstrates that the employer's discriminatory practices deterred [her] from applying." *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 558 (7th Cir. 2004); see also *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003) (holding that in a failure to promote claim the plaintiff must show that she applied for and was rejected for the promotion to establish an adverse employment action). The promotion available in March 2002 was a night-shift team leader position. When Hosier and Perkins asked Sublett which shift she wanted, she said that she was interested in the day-shift position. The district court rightly rejected Sublett's contention that Wiley violated her rights by not considering her for a position in which she did not express an interest.

We add for the sake of completeness that our examination of the record also convinces us that Sublett has not offered evidence showing that Wiley's reasons for its 2002 decisions were pretextual. There is nothing suspect about the fact that each of the individuals initially promoted to the team leader positions either quit or transferred from these posts. Nor can Sublett prevail by showing that a more astute employer would have evaluated the candidates' relative qualifications differently. She had to present some evidence that Wiley's stated reasons for hiring these employees were lies, and she has not done so. See *Hudson*, 375 F.3d at 562. Finally, without any evidence that Wiley always picked internal candidates (and there is none), the fact that Shoptaw was hired from outside the company also fails to help Sublett.

Sublett's final effort to salvage the 2002 claims is to criticize the district court for failing to consider Wiley's actions in the light of the entire record. In her view, the allegedly discriminatory action in 2000, as well as Wiley's

alleged ongoing history of discrimination against African-Americans, put the 2002 actions in a different light. The district court, however, did not ignore anything that it was required to consider. (In fact, the court patiently waded through Sublett's presentations, even though it expressed frustration with her "egregious departure" from the court's local rules governing summary judgment motions.) Although a plaintiff can demonstrate pretext in a variety of ways, including by presenting evidence of the employer's past treatment of the plaintiff or its practices with respect to minority employment, see *McDonnell Douglas*, 411 U.S. at 804-05, it is not clear how the stray comments Sublett identifies here, while offensive and inappropriate, support her argument that Hosier and Perkins were lying when they said that they did not initially promote Sublett because she was not as qualified as the selected candidates. Sublett failed to support her claim that Wiley's alleged failure to promote any African-Americans was circumstantial evidence of pretext with sufficient information about the relevant applicant pool. Because Sublett's evidence in response to Wiley's summary judgment motion did not support either her *prima facie* case or a finding of pretext, the district court correctly granted summary judgment in Wiley's favor on the claims relating to the 2002 promotions.

**IV**

Sublett's next complaint relates to the somewhat negative performance evaluations she received in 2001 and 2002, which she believes were motivated by race. A negative performance evaluation, however, does not in itself constitute an adverse employment action. See *Haywood v. Lucent Tech., Inc.*, 323 F.3d 524, 532 (7th Cir. 2003). Nonetheless, negative performance evaluations may serve as direct evidence of other discrimination or as evidence at the pretext stage to suggest that the defendant's articulated

reasons for the plaintiff's adverse employment action are false. *Id.*

On appeal, however, Sublett presents no evidence tending to show whether the 2001 and 2002 reviews depict anything other than an accurate description of her job performance. Sublett's only argument with respect to this claim appears to be her own view that she deserved a higher rating. This is not enough. As we have noted, "it is . . . axiomatic that a plaintiff's conclusory statements do not create an issue of fact. . . . 'An employee's self-serving statements about his ability . . . are insufficient to contradict an employer's negative assessment of that ability.'" *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 985 (7th Cir. 1999) (quoting *Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992) (internal citation omitted)). Sublett has done no more than this; she has thus failed to raise a question of material fact with respect to the performance reviews.

## V

Sublett finally also argues that Wiley unlawfully retaliated against her for filing a discrimination complaint by giving her negative performance evaluations in 2001 and 2002 and then failing to promote her in 2002. In *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640 (7th Cir. 2002), we clarified the standard for summary judgment on retaliation claims under Title VII. There are two distinct ways in which a plaintiff may establish a *prima facie* case for unlawful retaliation. First, the plaintiff may "present direct evidence (evidence that establishes without resort to inference from circumstantial evidence) that [she] engaged in protected activity (filing a charge of discrimination) and as a result suffered the adverse employment action of which [she] complains." *Stone*, 281 F.3d at 644. Second, the plaintiff may proceed under a framework similar to the *McDonnell Douglas* burden-shifting test by

showing that: "1) after lodging a complaint about discrimination, 2) only [she], and not any otherwise similarly situated employees who did not complain, was 3) subjected to an adverse employment action even though 4) [she] was performing her job in a satisfactory manner." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 897 (7th Cir. 2003) (quoting *Stone,* 281 F.3d at 642). "Failure to satisfy any one element of the *prima facie* case is fatal to an employee's retaliation claim." *Hudson*, 375 F.3d at 560. Even if a plaintiff establishes a *prima facie* case, the employer is entitled to summary judgment "unless there is a material issue of fact as to whether the employer's non-invidious reason is pretext for retaliation." *Hudson*, 375 F.3d at 560.

In granting summary judgment for Wiley, the district court reasoned that "too much time passed between the July 2000 exploration of reasons for her failure to receive a senior CCR position and the February 2002 promotion of Roberts to team leader for any telling temporal connection to exist from which the required causal relationship could be inferred." The district court's reference to a "required causal relationship" was not entirely accurate, since the employee is not required to present proof of a causal link between the protected expression and the adverse employment action to establish a *prima facie* case under the indirect method. *Johnson*, 325 F.3d at 897. Nonetheless, this error was harmless.

Sublett did not point to employees who were similarly situated to her for purposes of the 2002 promotions. It was up to her to find others who were "directly comparable in all material respects." *Hudson*, 375 F.3d at 561 (quoting *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)). Specific factors include whether the employees: "1) held the same job description, 2) were subject to the same standards, 3) were subordinate to the same supervisor, and 4) had comparable experience, education, and other qualifications—provided the em-

ployer considered these latter factors in making the person-nel decision." *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003). As our earlier discussion shows, however, Sublett was not comparable to the people who received the jobs in 2002 in the critical areas of education and work experience.

Sublett also alleges that the district court erred in granting summary judgment in favor of Wiley with respect to her claim that her negative performance evaluations in 2001 and 2002 were a form of retaliation for her com-plaint alleging race discrimination. As noted above, the 2001 Annual Performance Review used four possible ratings: "Outstanding Performance," "Exceeds Performance Expectations," "Proficient," and "Needs Improvement." Sublett received "Proficient" ratings in all six categories; her evaluation also included notations from her supervisors expressing their desire to see her become more of a leader and take more initiative within the department. On the basis of this review, Sublett received a 4% merit pay increase. In 2002, the review form was similar in all respects, with a roughly equivalent rating scale. Sublett's ratings were in the middle to lower-middle range. Based on the 2002 review, Sublett received a 3% salary increase.

As the basis for her retaliation claim, Sublett argues that these reviews, which were issued after she began complain-ing about race discrimination within the company, were considerably worse than her 2000 performance review. The format of the 2000 review, however, was dramatically different from the 2001 and 2002 review forms. For exam-ple, as compared to the six categories of evaluation on the 2001 and 2002 forms, the 2000 review contained 40 sepa-rate areas of evaluation. Additionally, in contrast to the three ratings an employee could receive for each category in 2000, there were four qualitative options on the 2001 and 2002 forms.

A reasonable trier of fact could not find that Sublett's 2000 reviews were better than the 2001 and 2002 reviews about which she complains. Although she received top ratings in three categories in her 2000 reviews, she received a middle-tier evaluation in the other 37 categories. In 2002, in addition to receiving four ratings that were equivalent to the "Proficient" ratings she received in 2001, she received two ratings that were one step below the highest ratings. This is not enough to permit a finding that Wiley impermissibly retaliated against Sublett by issuing her the performance reviews she received in 2001 and 2002.

## VI

We conclude that Sublett's evidence, construed most favorably to her, shows at most that certain individuals at Wiley made some unfortunate remarks and some contestible promotion decisions. This is not enough to permit a trier of fact to consider her discrimination or retaliation claims. We therefore AFFIRM the judgment of the district court.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*