NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted February 21, 2007[*]
Decided March 13, 2007

**Before**

Hon. FRANK H. EASTERBROOK, *Chief Judge*

Hon. RICHARD A. POSNER, *Circuit Judge*

Hon. TERENCE T. EVANS, *Circuit Judge*

No. 06-1846

| | |
|---|---|
| ROBERT R. SCHMIDT, | Appeal from the United States |
| *Plaintiff-Appellant,* | District Court for the Northern District of |
| | Illinois, Eastern Division |
| *v.* | |
| | No. 04 C 7508 |
| CANADIAN NATIONAL RAILWAY | |
| CORP., | Ronald A. Guzmán, |
| *Defendant-Appellee.* | *Judge.* |

**O R D E R**

Robert Schmidt filed a complaint against his employer under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to e-17, claiming sexual harassment and retaliation. The district court granted summary judgment in favor of the employer. Schmidt appeals, and we affirm.

---

[*] After an examination of the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. Fed. R. App. P. 34(a)(2).

We recount the facts in the light most favorable to Schmidt. He began working as a communications equipment technician for Canadian National Railway Corporation in Homewood, Illinois, in September 1999. He was permitted to use a company vehicle to commute and travel to work sites. In late October 2003 he went out on medical leave and remained off the job for more than three months, though he did not return the company vehicle before he left. Meanwhile, Bob Walker, his immediate supervisor, learned that Schmidt had moved from Richton Park, Illinois, where he lived when he started working for Canadian National, to North Judson, Indiana, 67 miles away. Walker e-mailed and called Schmidt to tell him he lived too far away to use the car for commuting purposes. Walker repeated the instruction again when Schmidt's medical leave ended in February 2004, but Schmidt did not immediately stop using the car to commute. Walker e-mailed him, saying, "Apparently you do not listen very well or value what I tell you to do." He ordered Schmidt to "park the company vehicle at the Homewood Administration Building," and not to use it to commute.

Schmidt then returned the car, but on February 29, 2004, he wrote the first of five letters to Laurent Caron, the human resources manager. Schmidt complained that Walker was "harassing" him by making him return the company car and allowing its use only during work hours. These restrictions were not imposed on other employees, he said, and he needed the company car because his wife was using the couple's other vehicle.

Two days later Schmidt wrote Caron a second letter, this time stating that he had overheard Walker angrily say "Fuck Robert Schmidt" when told that Schmidt had refused to sign a list of on-call employees. Schmidt told Caron that Walker then called him into his office and coerced him to sign the list with a threat: "Listen, you don't want to mess with me! If you don't sign this, I am going to make your life a living hell! I'll get you fired! Do you understand me completely?"

On March 14, Schmidt wrote Caron again. In this letter he alleged that Walker had harassed him on four occasions by rubbing his shoulders, grabbing his shoulder blades, and sliding both hands from his shoulders down his arms to the elbows, and then patting him on the back. The first occurrence, he said, was in October 1999, and the last was on October 24, 2003, the day before the start of his medical leave. Schmidt said he feared for his safety because Walker had told him he "gives people enough rope to hang themselves" and was under orders to make Schmidt "go away." Schmidt added that Walker had once leaned toward him while speaking threateningly.

On March 26, Schmidt wrote Caron for the fourth time. He complained that the help desk had called him several days earlier despite knowing he could not accept emergency calls because he did not have a vehicle. Walker, he said,

responded angrily when he refused to take the assignment. That night Schmidt had chest pains, and he was admitted to the hospital the next morning and did not return to work for nearly two weeks.

On April 4 Schmidt reported to Bob Keane, an Assistant Vice President, that he tried to claim the foregoing incident as a work-related injury, but when he had not received the paperwork from an administrative employee three days after he requested it, he asked to use vacation time instead to ensure a timely paycheck.

That same day, Schmidt wrote Caron a final time accusing Walker of sexual harassment. He pointed to Walker's past conduct and characterized it as sexual in nature. Caron interviewed Joseph Price, the only witness Schmidt identified, and Walker. Price denied witnessing or experiencing any sexually inappropriate behavior from Walker and said that, although Walker also had grabbed his shoulders and patted his back, he did not view the contact as inappropriate. Caron reminded Walker that some employees did not like being touched and told him to avoid touching the arms, backs, or shoulders of his employees. Caron then wrote to Schmidt, advising that he was unable to substantiate Schmidt's allegations. He explained that Canadian National was committed to preventing discrimination and harassment and told Schmidt to call if he had further questions or concerns.

In June 2004 Schmidt filed an EEOC charge claiming sexual harassment, and he amended it in July to allege retaliation for his sexual harassment complaints. Schmidt took an extended leave, and when he tried to return to work on March 14, 2005, his "heart raced" and he went to the hospital instead. The next day, he concluded that he "had no choice" but to quit his job and resigned.

Schmidt brought this action claiming both sexual harassment and retaliation. In addition to what he related in his letters to Caron, Schmidt alleged that in April 2004 Walker had glanced at his own crotch and smiled while the two were discussing work issues, which Schmidt interpreted as a request for oral sex in exchange for allowing Schmidt to keep his job. On another occasion, Schmidt said, Walker had told him it was "good to keep a plumber on his knees," a comment Schmidt viewed as reflecting Walker's homosexual desires. And, Schmidt continued, Walker had complimented Schmidt's voice once in May 2004 and had asked Schmidt to stay late one time in July 2004 because Walker was lonesome. Schmidt also alleged that Canadian National had retaliated for his complaints to Caron by withholding the paperwork he needed to claim that his overnight hospital stay was work-related, assigning him to monotonous database work when he returned to work after that incident, refusing to resolve the work vehicle issue, ordering him to sign the list of on-call employees, omitting his name from the recipients of an open-position notification, making him stay late before a holiday weekend when other employees were allowed to leave early, and changing his work

schedule. Schmidt also alleged that Walker retaliated against him by approaching him while he was on the phone and hitting him on the shoulder with the back of his hand. Schmidt included these additional allegations in an affidavit submitted at summary judgment.

On appeal, Schmidt first argues that he introduced sufficient evidence of a hostile work environment to survive summary judgment. Schmidt needed evidence that he was subjected to unwanted harassment, based on his sex, that was severe or pervasive enough to alter the conditions of his employment and cause a hostile environment. *See Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007). The purported harassment must have been offensive both subjectively and objectively. *Id.* at *8. To determine if it was objectively offensive, courts examine its frequency and severity, whether it humiliated or physically threatened the plaintiff, and whether it unreasonably interfered with the plaintiff's work performance. *Id.* Neither vulgar banter, *see id.*, nor occasional, non-extreme instances of short physical contact or staring are generally sufficient to allow an inference of an objectively hostile environment, *see Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 463-64 (7th Cir. 2002). *See also Johnson v. Hondo, Inc.*, 125 F.3d 408, 412 (7th Cir. 1997). As the district court noted, Schmidt provided evidence that over four years Walker rubbed his shoulders four times, used vulgar language, stared suggestively at his own crotch, asked Schmidt to stay late one time, and complimented his voice another time, but, like the occurrences in *Hilt-Dyson* and *Johnson*, these isolated incidents are too insignificant, even if sexual in nature, to allow a reasonable inference that Schmidt suffered an objectively hostile work environment.

Schmidt also contends that he engaged in a protected activity and "offered facts . . . to suggest that all other employees, similarly situated or otherwise," were treated more favorably, so the district court erred in granting summary judgment to Canadian National on his retaliation claim. Title VII forbids an employer from retaliating against an employee for engaging in an activity protected by Title VII. *See Kampmier*, 472 F.3d at 939. Schmidt offered no direct evidence of retaliation, so the district court properly analyzed his claim under the indirect method, which requires him to show that he (1) engaged in a statutorily protected activity, (2) was meeting Canadian National's legitimate employment expectations, (3) suffered a materially adverse action, and (4) was treated less favorably than similarly situated employees who did not engage in protected activity. *Burlington N. & Santa Fe Ry. v. White*, 126 S.Ct. 2405, 2415 (2006); *Phelan v. Cook County*, 463 F.3d 773, 787 (7th Cir. 2006). We may assume that Schmidt's evidence satisfies the first two elements, but it does not meet the third and fourth.

For the third element, an employer's action is considered materially adverse if it might dissuade a reasonable employee from engaging in protected activity.

*Burlington N. & Sante Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415 (2006); *Roney v. Ill. Dep't of Transp.*, 474 F.3d 455 (7th Cir. 2007). While some of the acts about which Schmidt complains, such as altering his work schedule to make it start and end one hour later, forcing him to use vacation time, or changing his duties *may*, in some situations, be considered materially adverse, *see Burlington*, 126 S.Ct. at 2417 (altering plaintiff's duties to make them more difficult and less prestigious than before); *Washington v. Ill. Dep't of Rev.*, 420 F.3d 658, 662 (7th Cir. 2005) (changing plaintiff's work hours with knowledge that she needed set hours to care for disabled son and thereby forcing her to use vacation time and essentially cutting her pay by 25%), Schmidt did not provide evidence that the actions were materially adverse in this case. He gave no reason for needing his work hours to stay constant, that his *temporary* reassignment to database work (after his two-week absence because of chest pains, hospitalization, and recovery) was less prestigious or more difficult than his ordinary duties, or that Canadian National induced him to spend his vacation time.

The remainder of what Schmidt calls retaliation cannot possibly be characterized as materially adverse. Schmidt says that his boss or others refused to resolve the work vehicle issue, forced him to sign a list of on-call employees, failed to send him one open-position notification, made him stay late before one holiday weekend when others were permitted to leave early, that struck him on the back with a hand while he was on the phone. As for the first, Schmidt's commuting privileges in the work vehicle were taken from him *before* he complained to Canadian National about sexual harassment, and it would be untenable to classify the company's refusal to return those rights as retaliatory simply because he *later* accused his boss of harassment. As for the second, Schmidt's letters to management indicate that the list of on-call employees included "the rest of [his] co-workers," not that he alone was made to sign it in retaliation for his complaints about his boss. Also, while it would appear that it could be a materially adverse action to omit an employee's name from open-position notifications, in this case, Schmidt had told Caron in a letter that it was "mandatory for [him] to live" where he did because his wife was in poor health and needed to be near her family. The single position notification he did not receive was for a job in Champaign, Illinois. While he now says that he does not know if he would have applied for the position or moved, it would contradict the letter in the record if he says he would have. Further, even if making a reasonable employee stay later than his co-workers on one occasion or hitting him once (apparently lightly, as there is no evidence of injury) could ever deter that employee from engaging in a protected activity, in this case, they do not rise to the level of a materially adverse action.

In any event, Schmidt has also failed to identify any similarly situated employee who did not engage in protected activity and was treated more favorably, as he must to survive summary judgment. *See Kampmier*, 472 F.3d at 940; *Anders v. Waste Mgmt. of Wis., Inc.*, 463 F.3d 670, 768 (7th Cir. 2006).

Schmidt's remaining contentions are without merit. To the extent he argues that the district court erred in denying him leave to amend his complaint, we note no abuse of discretion. *See Perry v. First Nat. Bank*, 459 F.3d 816, 819, 823-25 (7th Cir. 2006); *Bethany Pharmacal Co., Inc. v. QVC, Inc.*, 241 F.3d 854, 861-62 (7th Cir.2001). His other arguments warrant no discussion.

AFFIRMED.